UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| Anthony Dickerson, | ) | Civil Action No.: 9:26-cv-00898-DCN |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | COMPLAINT |
| | ) | |
| NetCredit Loan Services, LLC, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

1. This is an action brought by Plaintiff, Anthony Dickerson, for actual, statutory and punitive damages, attorney's fees, and costs for Defendant's violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*, (hereinafter "FCRA"), and for compensatory and punitive damages for Defendant's violations of South Carolina common law set forth herein.

2. The FCRA exists to protect consumers' privacy and to impose upon those who trade in consumers' private information strict requirements to ensure that the information they report is as accurate as possible.

3. Before the enactment of the FCRA, inaccurate and misleading information was identified as "the most serious problem in the credit reporting industry." 115 Cong. Rec. 2411 (Jan. 31, 1969). With this problem in mind, Congress enacted the FCRA "to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report." S. Rep. No. 91-517 (1969).

4. To accomplish Congress' goals, the FCRA contains a variety of requirements to

1

protect consumers, including §§ 1681e and 1681s-2(b), which are two of the cornerstone provisions of the FCRA.

5. One of the primary purposes of the FCRA is to assure "maximum possible accuracy" of consumer information to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

6. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed* (emphasis added).

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)].

## JURISDICTION AND VENUE

7. This Court has Jurisdiction under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681p, and 28 U.S.C. §§1331 and 1367.

8. Venue is proper in the Beaufort Division because the Plaintiff resides in Beaufort

County, and the Defendant transacted business throughout South Carolina and in this division.

## PARTIES

9.     Plaintiff, Anthony Dickerson, is a resident and citizen of the State of South Carolina, Beaufort County, and is over the age of twenty-one (21) years. Plaintiff is a consumer as that term is defined by the FCRA, 15 U.S.C. §1681a(c).

10.    Defendant NetCredit Loan Services, LLC ("NetCredit") is a Delaware corporation that may be served with process through its Registered Agent, CT Corporation System, 2 Office Park Ct, Suite 103, Columbia, South Carolina 29223. In all respects and at all times relevant herein, Defendant was doing business in the State of South Carolina and in this division.

## FACTUAL ALLEGATIONS

11.    Plaintiff is the owner and operator of a funeral home which provides custom funeral services in the counties of Beaufort and Jasper.

12.    On or about February 2, 2024, Plaintiff sent a letter to Defendant informing Defendant that he never opened an account with it. Plaintiff also requested Defendant remove the Account from his credit reports.

13.    On or about April 15, 2024, Plaintiff reviewed his TransUnion credit report and discovered several fraudulent accounts were reporting as belonging to him. Specifically, NetCredit, Account No. 2017SC86832**** (hereinafter the "Account"), which Plaintiff never opened or authorized, was reporting as a derogatory account on Plaintiff's TransUnion credit reports.

3

14. On or about May 17, 2024, Plaintiff filed an FTC Identity Theft Affidavit identifying several accounts, including the Account, as fraudulent.

15. On or about May 17, 2024, Plaintiff also filed complaints with the Consumer Financial Protection Bureau (hereinafter "CFPB") against each of the Consumer Reporting Agencies ("CRAs"), Equifax, Experian and TransUnion. In these complaints, Plaintiff stated he had reviewed his credit reports and found several fraudulent accounts opened in his name. Plaintiff informed the CFPB that he was upset and distressed by the discovery he had been the victim of identity theft because he was currently applying for credit and needed his credit reports to be correct. With his complaints, Plaintiff attached a copy of his FTC Fraud Affidavit.

16. On or about June 22, 2024, TransUnion responded to Plaintiff's complaint through the CFPB. In that response, TransUnion informed Plaintiff that it had forwarded a copy of its Investigation Results to him through the US mail. TransUnion also informed Plaintiff that, despite receipt of his FTC Fraud Affidavit, it was not able to block the fraudulent accounts being reported on his credit report, but it did contact the creditors reporting the accounts to verify the accuracy of said accounts. TransUnion specifically informed Plaintiff that Defendant verified its reporting of the Account as accurate.

17. On or about June 24, 2024, Plaintiff filed a complaint against Defendant with the CFPB wherein he stated he had been contacted by Defendant about past due payments on an Account that did not belong to him. Plaintiff informed the CFPB that he told Defendant he did not open or authorize any account with Defendant, and that he had requested documentation regarding the Account, but Defendant never responded.

4

18. In July 2024, in an effort to get the fraudulent Account removed from his credit report as quickly as possible, Plaintiff hired Credit Beast, a credit repair service.

19. On or about July 9, 2024, Defendant responded to Plaintiff's complaint through the CFPB. In that response, Defendant stated that on July 25, 2017, someone identifying themselves as Plaintiff applied for an installment loan with Defendant and that during the application process, Plaintiff's date of birth and social security number were provided. As a result, on July 27, 2017, Defendant approved a $5,000 installment loan which was acknowledged and accepted by an electronic signature. Defendant stated that due to continued non-payment, the account became due in full on January 31, 2022, and on May 12, 2022, the outstanding balance was sold to debt buyer, Plaza Services. Plaintiff was instructed to contact Plaza Services directly. Defendant acknowledged that on January 31, 2022, Plaintiff contacted Defendant's customer support team requesting validation of the debt owed to Defendant. Defendant also acknowledged that their records confirmed that Plaintiff had previously submitted a credit dispute asserting he was the victim of identity theft. Finally, Defendant stated that for it to begin an investigation of Plaintiff's dispute, Plaintiff would need to file a police report and provide a copy of same to Defendant.

20. On or about August 28, 2024, Plaintiff filed a police report with the Beaufort County Sheriff's Department.

21. On or about August 30, 2024, Plaintiff file a second complaint against TransUnion with the CFPB, disputing multiple fraudulent accounts including the Account, and requesting that the Account be deleted from his credit report. Upon receipt of Plaintiff's dispute, TransUnion forwarded same to Defendant.

5

22. On or about September 10, 2024, Plaintiff filed a second FTC Fraud Affidavit adding an additional fraudulent account.

23. On or about October 2, 2024, Plaintiff sent dispute letters directly to TransUnion through Credit Beast, wherein Plaintiff disputed the Account as fraudulent. Upon receipt of Plaintiff's disputes, TransUnion forwarded same to Defendant.

24. On or about October 5, 2024, TransUnion responded to Plaintiff's dispute through the CFPB. In that response, TransUnion informed Plaintiff that it had investigated Plaintiff's disputes, and Defendant had verified and updated the Account as reported. Accordingly, the fraudulent, derogatory Account continued to be reported on Plaintiff's TransUnion credit report.

25. On or about December 20, 2024, TransUnion forwarded Plaintiff a letter stating it had received his Fraud Block Request. In this letter, TransUnion claimed that it takes cases of identity theft very seriously, but then refused to block the reporting of the fraudulent Account despite receipt of Plaintiff's police report.

26. On or about December 30, 2024, more than ten (10) months after Plaintiff's letter to Defendant informing Defendant the Account was fraudulent and more than six (6) months after Plaintiff's complaint against Defendant to the CFPB about the Account, Plaintiff obtained a copy of his TransUnion credit report and discovered that Defendant was still reporting the Account as a derogatory account belonging to Plaintiff.

27. In or around January 2025, Plaintiff terminated Credit Beast's services because his credit reports continued to contain inaccurate and fraudulent account information.

28. On or about January 10, 2025, TransUnion forwarded Plaintiff its Investigation

Results, wherein TransUnion informed Plaintiff that Defendant verified the Account as accurate and updated it. As a result, the disputed Account remained on Plaintiff's credit report. With the Investigation Results, TransUnion also included an updated copy of Plaintiff's TransUnion credit report dated January 10, 2025, which confirmed that Defendant was continuing to report the fraudulent, derogatory Account as belonging to Plaintiff.

29. On or about February 24, 2025, Plaintiff sent a dispute letter to TransUnion. In this letter, Plaintiff informed TransUnion that he had been the victim of identity theft, and that the Account, among others, was a fraudulent account opened in his name without his permission. Plaintiff provided his Social Security number, date of birth, and address in his letter to TransUnion. TransUnion received Plaintiff's dispute on March 13, 2025, and thereafter forwarded same to Defendant.

30. On or about March 6, 2025, TransUnion forwarded its Investigation Results to Plaintiff and included an updated copy of Plaintiff's credit report. The fraudulent Account remained on Plaintiff's credit report.

31. On or about March 6, 2025, Defendant knowingly and intentionally sold, assigned, or otherwise transferred the fraudulent Account to Central Portfolio Control, Inc. ("CPC"), for collections.

32. On or about March 26, 2025, Plaintiff sent a dispute letter to TransUnion. In this letter, Plaintiff stated he had received TransUnion's Investigation Results, but there were still fraudulent and incorrect accounts appearing on his credit report. Plaintiff again stated he had been the victim of identity theft and specifically disputed the Account as fraudulent.

With his dispute, Plaintiff provided a copy of the police report he filed, his driver's license, and his Social Security card. TransUnion received Plaintiff's dispute on April 3, 2025, and thereafter forwarded same to Defendant.

33. On or about March 28, 2025, TransUnion mailed Investigation Results to Plaintiff. In these results, TransUnion informed Plaintiff that Defendant had again verified the Account as accurate. As a result, the Account continued to be reported as a derogatory account belonging to Plaintiff on Plaintiff's credit report.

34. On or about April 3, 2025, TransUnion forwarded Plaintiff a letter stating it had received Plaintiff's fraud block request, but it again refused to block the reporting of the Account.

35. On or about April 24, 2025, TransUnion forwarded Plaintiff its Investigation Results, showing that Defendant again verified the fraudulent Account as accurate. Accordingly, the Account continued to wrongfully report on Plaintiff's credit report as a derogatory account.

36. On or about May 7, 2025, Plaintiff sent a new dispute letter to TransUnion. In this letter, Plaintiff again disputed the Account as a fraudulent account opened in his name without his knowledge or permission. With his dispute letter, Plaintiff included a copy of the police report he filed in August 2024, and a copy of his driver's license. TransUnion received Plaintiff's dispute on May 14, 2025, and thereafter forwarded same to Defendant.

37. On or about June 7, 2025, TransUnion forward Plaintiff its Investigation Results showing that, despite Defendant's receipt of Plaintiff's police report, Defendant had again verified the reporting of the Account as accurate.

8

38.     On or about July 8, 2025, Plaintiff was alerted that a new collection account had been added to his credit reports.  Accordingly, Plaintiff obtained a new copy of his TransUnion credit report and discovered Central Portfolio Control, Account #PLZ##****, (hereinafter the "CPC Account"), was reporting as a collection account for original creditor NetCredit.

39.     On or about July 9, 2025, Plaintiff filed another FTC Identity Theft Report wherein he again specifically listed the Account as a fraudulent account.

40.     On or about July 9, 2025, Plaintiff received his credit report and dispute results from Experian which showed the CPC Account was reporting as a new collection account opened on March 6, 2025.

41.     On or about August 4, 2025, Plaintiff sent a dispute letter to Defendant  In this letter, Plaintiff informed Defendant that he had been the victim of identity theft, and that the Account was a fraudulent account opened in his name without his knowledge or permission. Plaintiff requested Defendant to send him a copy of the application used to open the fraudulent account, along with any payments made on the account.  With his letter, Plaintiff included a copy of his police report. Plaintiff provided his Social Security number, date of birth, and address in his letter to Defendant.  Defendant received Plaintiff's dispute on August 13, 2025.

42.     On or about August 4, 2025, Plaintiff sent a dispute letter to Experian. In this letter, Plaintiff stated he had received a copy of Experian's Dispute Results and discovered that a new collection account, the CPC Account, was reporting on his credit report for the fraudulent Account that was opened in his name without his knowledge or permission.

9

With his letter, Plaintiff included a copy of the police report he filed, and a copy of the FTC Identify Theft Report he filed on July 9, 2025. Experian received Plaintiff's dispute on August 14, 2025.

43. On or about August 4, 2025, Plaintiff sent a new dispute letter to TransUnion. In this letter, Plaintiff stated he had received TransUnion's Investigation Results and, in addition to the accounts he previously disputed which were still reporting inaccurately on his credit report, a new collection account, the CPC Account, had been added. Plaintiff again specifically disputed both the Account and the CPC Account on his TransUnion credit report. With his dispute letter, Plaintiff included another copy of his police report, as well as a copy of his new FTC Identity Theft Report dated July 9, 2025. TransUnion received Plaintiff's dispute on August 15, 2025, and thereafter forwarded same to Defendant.

44. On or about September 8, 2025, Experian forward Plaintiff its Investigation Results showing that the CPC Account had been removed.

45. On or about September 10, 2025, TransUnion forwarded Plaintiff its Investigation Results, wherein TransUnion informed Plaintiff the disputed CPC Account had been deleted from Plaintiff's credit report. However, the Account had once again been verified as accurate by Defendant. Accordingly, the fraudulent, derogatory Account continued to be reported as belonging to Plaintiff on his TransUnion credit report.

46. For almost two years Plaintiff has been working to purchase a home for his family, but Defendant's continued refusal to remove the fraudulent Account from Plaintiff's credit report continuously thwarted that goal.

47. To date, Defendant continues to intentionally and maliciously report the fraudulent Account as belonging to Plaintiff to TransUnion, which in turn provides Plaintiff's credit reports to multiple third parties including Plaintiff's creditors, potential creditors, insurance companies and others.

48. From at least March 2024, through the present, Defendant has reported false, libelous, inaccurate, and defamatory information regarding the Plaintiff to the national credit bureaus and to numerous third parties. While Defendant reported the fraudulent Account as belonging to Plaintiff on his credit reports, said information was provided to and/or viewed by Navy FCU, Mission Lane, Capital One Auto Finance, Serpentini Chevrolet, Granite Bay Acceptance Company, Progressive Insurance, Debthunch, Advantage 1st Financial, LLC, Capital One, First National Credit Card, FSB Blaze Credit Card, TAB/Mission Lane, The Bank of Missouri, EC Hilton Head Regional Medical Center, TD Banknorth, CPC Credit Vision, Verizon Wireless, Jewelers Mutual Insurance, First National Credit Card, GMFinancial, First Sav BankBlaze, Ally Financial, Lenders Protection, LLC, Pagaya, and others.

49. Additionally, Defendant transferred, sold, or otherwise assigned the Account to CPC which resulted in an additional derogatory collection account being added to his credit reports and subjected Plaintiff to collection efforts by CPC.

50. Defendant's knowing and repeated violations of the FCRA warrants an award of punitive damages. *See, e.g., Younger v. Experian Info. Sols. Inc.,* Case No. 2:15-cv-00952-SGC, at *30 (N.D. Ala. Mar. 21, 2019) (awarding punitive damages for repeated, willful violations of the FCRA).

**COUNT ONE**
**(Violation of the Fair Credit Reporting Act)**

51. Plaintiff hereby adopts all of the allegations set forth in paragraphs 11 through 50 as if set forth fully herein.

52. The FCRA was created to protect consumers from the transmission of inaccurate information about them. *Guimond v. Trans Union Credit Information Co., 45 F.3d 1329, 1333 (9th Cir. 1995).*

53. The law in this District, the Fourth Circuit, and even nationally has long ago been articulated to require a detailed and searching investigation by a furnisher when it receives a consumer's FCRA dispute through a consumer reporting agency.

54. Defendant violated 15 U.S.C. §1681s-2(b) by failing to investigate the accuracy of the information reported by the Defendant to the consumer reporting agencies.

55. On at least one occasion within the past two years, by example only and without limitation, Defendant violated 15 U.S.C. §1681s-2(b)(1)(A) by failing to fully and properly investigate after receiving notice that the Plaintiff disputed the information said Defendant had provided to a consumer reporting agency.

56. On at least one occasion within the past two years, by example only and without limitation, Defendant violated 15 U.S.C. §1681s-2(b)(1)(B) by failing to review all relevant information provided by the consumer reporting agencies.

57. As a result of Defendant's violations of 15 U.S.C. §1681s-2(b)(1)(A) and (B), Plaintiff suffered actual damages including, but not limited to, delay in seeking credit to purchase a home, lost opportunities to receive credit, damage to his reputation and credit

reputation, worry, anxiety, physical sickness, physical pain, headaches, loss of sleep, distress, anger, family discord, loss of enjoyment of life, frustration, embarrassment, and humiliation. Plaintiff is entitled to actual damages in an amount to be determined by the jury.

58. Defendant completely failed and/or refused to conduct a detailed and searching inquiry as required by the FCRA. Instead, Defendant simply verified the Account each and every time it received an ACDV regarding Plaintiff's dispute of the Account as not his and/or fraudulent.

59. The violations by Defendant were willful, rendering Defendant liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n. In the alternative, Defendant was negligent, entitling the Plaintiff to recovery under 15 U.S.C. §1681o.

60. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Defendant in an amount to be determined by a jury pursuant to 15 U.S.C. §1681n and §1681o.

## COUNT TWO
### (Fair Credit Reporting Act)

61. The Plaintiff adopts the averments and allegations of paragraphs 11 through 60 hereinbefore as if fully set forth herein.

62. On one or more occasions within the past two years, by example only and without limitation, Defendant violated 15 U.S.C. §1681s-2(b)(1)(C) and (D) by publishing the Defendant's inaccuracies within Plaintiff's credit files with the credit reporting agencies

and by failing to correctly report results of an accurate investigation to each credit reporting agency.

63. Defendant violated 15 U.S.C. §1681s-2(b)(1)(C) by reporting inaccurate, incomplete, false, and misleading results of the investigation, if any, to at least one consumer reporting agency.

64. Defendant violated 15 U.S.C. §1681s-2(b)(1)(D) by failing to notify all consumer reporting agencies that the reporting of the Account was inaccurate, incomplete, false, and misleading.

65. Defendant failed to add a Compliance Condition Code when responding to ACDVs received from the credit reporting agencies.

66. Defendant knew that Plaintiff disputed the subject account on at least one occasion directly with Defendant and its agents.

67. The Plaintiff's disputes were, at a minimum, *bona fide*.

68. As a result of Defendant's violations of 15 U.S.C. §1681s-2(b)(1)(C) and (D), the Plaintiff has suffered and will continue to suffer actual damages including, but not limited to, delay in seeking credit to purchase a home, lost opportunities to receive credit, damage to reputation and credit reputation, worry, anxiety, physical sickness, physical pain, headaches, loss of sleep, distress, anger, family discord, loss of enjoyment of life, frustration, embarrassment, and humiliation. Plaintiff is entitled to actual damages in an amount to be determined by the jury.

69. The violations by Defendant were willful, rendering Defendant liable for punitive damages in an amount to be determined by the jury pursuant to 15 U.S.C. §1681n. In the

alternative, Defendant was negligent, entitling the Plaintiff to recovery under 15 U.S.C. §1681o.

70.     The Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees, pursuant to 15 U.S.C. §1681n and §1681o.

## COUNT THREE
### (Defamation, Libel and Slander)

71.     The Plaintiff adopts the averments and allegations of paragraphs 11 through 70 hereinbefore as if fully set forth herein.

72.     Defendant willfully, wantonly, recklessly and/or maliciously published and communicated false and defamatory statements regarding Plaintiff to third parties and the public at large.  Defendant also willfully, wantonly, recklessly and/or maliciously sold, assigned, and/or transferred the Account to CPC, a debt collector.  Said statements harmed Plaintiff's reputation and credit reputation, and caused Plaintiff to suffer severe damages, including the reporting of the additional CPC Account as a collection account on his credit reports as well as collection efforts by CPC.

73.     Said communications were false in that Plaintiff was not indebted to Defendant. Plaintiff did not owe any balance on the Account that is the subject of this action as it was a fraudulent account.

74.     Said false and defamatory statements have harmed the reputation of Plaintiff and/or deterred third persons from associating with Plaintiff.  While Defendant has reported the fraudulent Account as belonging to Plaintiff on his credit reports, said information was provided to and/or viewed by Navy FCU, Mission Lane, Capital One Auto Finance,

Serpentini Chevrolet, Granite Bay Acceptance Company, Progressive Insurance, Debthunch, Advantage 1st Financial, LLC, Capital One, First National Credit Card, FSB Blaze Credit Card, TAB/Mission Lane, The Bank of Missouri, EC Hilton Head Regional Medical Center, TD Banknorth, CPC Credit Vision, Verizon Wireless, Jewelers Mutual Insurance, First National Credit Card, GMFinancial, First Sav BankBlaze, Ally Financial, Lenders Protection, LLC, Pagaya, and others.

75. Defendant communicated to third parties, including CPC, and the public at large false information concerning Plaintiff, disseminating and imputing false and misleading credit worthiness information concerning Plaintiff, including but not limited to reporting that Plaintiff owed the Account that is the subject of this action.

76. At the time said communications were made, Defendant knew or should have known the falsity of the communications or recklessly disregarded the potential inaccuracy of the information, yet knowingly, willfully and maliciously communicated the falsity.

77. As a result of the intentional communications to third parties of the false information, Plaintiff was caused to suffer injury to his reputation in the eyes of his community and the public at large, and was forced to endure credit reporting of the Account, as well as reporting of the collection account by CPC, in spite of the fact that Plaintiff did not owe the Account, as said Account was fraudulently opened in his name.

78. As a proximate consequence of said defamation, libel and slander, the Plaintiff suffered damage to his credit and credit reputation, was denied credit, was forced to delay in applying for credit, and lost credit opportunities. Additionally, Plaintiff suffered humiliation, anxiety, stress, loss of sleep, anger, worry, physical sickness, headaches,

mental anguish, family discord, and loss of enjoyment of life for which he seeks compensatory and punitive damages.

## AMOUNT OF DAMAGES DEMANDED

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands a judgment against Defendant for the following:

A.    Actual and statutory damages from Defendant pursuant to 15 U.S.C. §1681n(a)(1)(A) and/or 15 U.S.C. §1681o(a)(1);

B.    Punitive damages from Defendant pursuant to 15 U.S.C. §1681n(a)(2);

C.    Costs and reasonable attorney's fees from Defendant pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2);

D.    For compensatory and punitive damages in an amount to be determined by a struck jury for Defendant's defamation, libel and slander;

E.    For this trial to be heard by a jury; and

F.    For all such other and further relief as the Court may deem just and proper.

/s/ Penny Hays Cauley  
Penny Hays Cauley, Fed. ID No. 10323  
Attorney for Plaintiff

**OF COUNSEL:**  
HAYS CAULEY, P.C.  
1303 West Evans Street  
Florence, SC 29501  
(843) 665-1717  
phc917@hayscauley.com

**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY ON ALL COUNTS**

/s/ Penny Hays Cauley  
Of Counsel

**DEFENDANT TO BE SERVED VIA CERTIFIED MAIL,**
NetCredit Loan Services, LLC
c/o CT Corporation System – Registered Agent
2 Office Park Ct, Suite 103
Columbia, South Carolina 29223